**MORGAN, LEWIS & BOCKIUS LLP**
*(Pennsylvania Limited Liability Partnership)*
Thomas A. Linthorst (Bar Roll# 519222)
Jason J. Ranjo (*pro hac vice forthcoming*)
502 Carnegie Center
Princeton, New Jersey 08540-7814
(609) 919-6642 (phone)
(609) 919-6701 (fax)

*Attorneys for Plaintiff*
*Novo Nordisk Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOVO NORDISK INC., | Case No. 6:19-cv-1092 (BKS/ATB) |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT** |
| JAMES VINCENT STEPHENS and BIOMARIN PHARMACEUTICAL INC., | |
| Defendants. | |

Plaintiff Novo Nordisk Inc. ("Novo Nordisk" or "the Company"), by and through the

undersigned counsel, Morgan, Lewis & Bockius, LLP, hereby brings the following Verified

Complaint against Defendants James Vincent Stephens ("Stephens") and BioMarin

Pharmaceutical Inc. ("BioMarin") (collectively, "Defendants"), seeking injunctive relief and

other relief, and allege as follows:

## SUMMARY

1.      Up until September 4, 2019, Defendant James Stephens was Plaintiff Novo

Nordisk's Hemophilia BioPharm Regional Director ("HBRD") for its hemophilia product sales

in the Northeast.  Stephens has voluntarily resigned his employment at Novo Nordisk to

immediately join Defendant BioMarin as director of its hemophilia sales organization in the

Northeast, for a hemophilia product it anticipates launching soon, which will be directly competitive with Novo Nordisk's hemophilia products.

2.     The market for hemophilia products is intensely competitive.  The condition at issue in this case – Hemophilia A – is a serious and life-threatening disease, but is also very rare, with only approximately 12,000 to 15,000 patients in the United States.  With so few patients, and with the cost to develop and bring a treatment to market being so high, the cost of treatment is very expensive, and is typically borne by commercial and governmental payers.  As a result, each Hemophilia A treatment may account for significant revenue for a company offering a treatment.

3.     At the time of his hire by Novo Nordisk, Stephens agreed to a Confidentiality, Non-Compete and Employee Invention Agreement (the "Agreement"), which contains certain narrow restrictions protective of Novo Nordisk's confidential information and customer relationships.  In particular, the Agreement prohibits Stephens from providing services for another company in the same disease state as that in which he worked for Novo Nordisk – in this case hemophilia – for a period of one year.  The Agreement further prohibits Stephens from using or disclosing Novo Nordisk's confidential information.  **Significantly, the Agreement provides that Novo Nordisk will pay Stephens his entire base salary during the one-year non-compete period, minus any amounts Stephens earns while abiding by the Agreement.**

4.     Novo Nordisk invested significantly in Stephens by promoting him to lead its hemophilia sales organization in the Northeast, paying him significant annual compensation, and entrusting him with Novo Nordisk's confidential information and key relationships with the hemophilia patient community.  To permit Stephens to resign from his employment and immediately commence employment as the director of BioMarin's hemophilia sales organization

in the Northeast, in direct violation of his Agreement with Novo Nordisk, would irreparably harm Novo Nordisk by permitting Stephens to use and disclose Novo Nordisk's confidential, proprietary, and trade secret information, and harming Novo Nordisk's customer relationships.

5.      This case seeks to prevent Stephens from breaching his Agreement with Novo Nordisk, and violating his statutory and common law duties, as well as preventing BioMarin from competing unfairly and unlawfully with Novo Nordisk.

## PARTIES

6.      Novo Nordisk is a corporation authorized under the laws of the State of Delaware and is the United States affiliate of Novo Nordisk A/S of Copenhagen Denmark.  The Company's principal place of business is in New Jersey.

7.      Stephens is an individual who, upon on information and belief, currently resides in Utica, New York.

8.      BioMarin is a corporation authorized under the laws of the State of Delaware with its principal place of business in California.  BioMarin's headquarters is located at 770 Lindaro Street, San Rafael, California 94901, and the company has a registered agent for service of process purposes located at 80 State Street, Albany, NY 12207.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is one that arises under the laws of the United States.

10.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), because Defendant Stephens resides in this district and Defendant BioMarin is a resident of this district

and/or the State of New York.  Additionally, a substantial part of the events giving rise to the claims occurred in this district.

**FACTUAL ALLEGATIONS**

**A.**      **The Hemophilia Treatment Market**

12.      The market for hemophilia treatments is unique.  First, hemophilia is an extremely rare disease.  The number of people in the United States with Hemophilia A is estimated to be approximately between 12,000 and 15,000.  By comparison, approximately 1.7 million people in this country are diagnosed with cancer every year.

13.      In addition, in part because the population of hemophilia patients is small, and the cost to develop and bring a treatment to market is so high, the cost of treatment is very expensive.  Treatments for even a single Hemophilia A patient may generate significant annual revenue.

14.      Finally, although for most disease states, pharmaceutical and biopharmaceutical companies typically focus personal promotion of their products (i.e., sales representative activity) to healthcare providers and institutions, hemophilia patients have lobbied for, and been successful in obtaining, different rules allowing manufacturers of hemophilia products to also engage in personal promotion directly to hemophilia patients, in addition to providers and institutions, among others.

15.      These circumstances create a very competitive environment, where each patient relationship is extremely valuable and each sales contact (whether with a patient, HTC, institution, health care provider, or patient advocacy group or chapter) plays an important part in a company's success in the hemophilia market.

B.      **Novo Nordisk's Hemophilia Therapeutic Area**

16.     Novo Nordisk offers products in several therapeutic areas, including the treatment

of hemophilia.

17.     Novo Nordisk markets and sells two products to treat Hemophilia A –

NovoEight® and Esperoct®.

18.     Novo Nordisk's hemophilia sales organization is divided into four regions:  East,

West, South, and Central.  A Hemophilia BioPharm Regional Director ("HBRD") leads each

region and typically supervises between six (6) and nine (9) hemophilia representatives.

19.     Since approximately September 2018, Stephens has been the HBRD for the East

Region.

20.     The East Region spans from North Carolina to Maine, and includes New Jersey,

New York, and Pennsylvania.

21.     Novo Nordisk's success and brand in the Hemophilia A marketplace are based, in

substantial part, on commercially valuable confidential and proprietary business information

developed at great effort and expense over many years, which information is not publicly known

or readily ascertainable.  Such confidential and proprietary information includes, but is not

limited to, business strategies, including strategies for each of the sales channels for Novo

Nordisk's Hemophilia A products (including a sales strategy that Stephens was privy to that

Novo Nordisk has not yet launched); hemophilia sales structures and strategies; insights and

feedback on the effectiveness of the business and sales strategies; identities and information

relating to hemophilia patients; information relating to Hemophilia Treatment Centers (HTCs);

information relating to health care providers who treat hemophilia patients (often hematologists);

information relating to institutions that treat hemophilia patients (often hospitals); and

information relating to patient advocacy groups and chapters (collectively the "Confidential Information").

22.     Last year, Novo Nordisk revised its hemophilia sales structure and strategy.  Novo Nordisk has developed specific strategies and structures for its hemophilia sales organization, including specialized roles for its hemophilia representatives.  Stephens was responsible for implementing the new structure and strategy for the East region, and has been privy to confidential insights and feedback on the effectiveness of the new structure and strategy.

23.     In managing hemophilia representatives, Stephens reviewed and coached them on their business plans and strategies for their territories, aligning their business plans and strategies with Stephens' plans and strategies for the East Region.  Stephens reviewed their patient contacts and patient pipelines (patients who are prospective users of Novo Nordisk's hemophilia products), and rode along with the hemophilia representatives in their territories, jointly meeting with patients and their families, HTCs, health care providers, institutions, and patient advocacy groups and chapters.

24.     Stephens thus developed relationships with Novo Nordisk's direct customers and prospective customers, as well as those able to influence Novo Nordisk's hemophilia business.

25.     Stephens also was privy to significant confidential and proprietary information about those patients and their families, HTCs, health care providers, institutions, and patient advocacy groups and chapters, such as the patients' identities, contact information, and information about the identities, contact information, and decisionmaking process of the HTCs, health care providers, and institutions.

26.     Among the Novo Nordisk Confidential Information to which Stephens was privy was information about HTCs and institutions.  Stephens and his team developed advocacy maps

that identify who in the organization makes or influences the decisions on hemophilia treatments, their processes for making decisions, and how best to advocate for the use of a hemophilia product given this information.  Stephens and his team also developed information relating to different HTCs and their relationships with hospitals, which vary for each HTC.  Understanding those relationships and how they impact the decisionmaking of each for hemophilia treatments is critical to the success of hemophilia product sales.  Stephens and his team also developed approaches to the largest HTCs and their aligned hospitals.

27.     Stephens also was privy to Confidential Information relating to patient advocacy organizations and chapters.  Stephens and his team developed important relationships with these organizations, which offer opportunities to connect with hemophilia patients and their families, and are a key source of patients (and prospective customers) of Hemophilia A products. Stephens was privy to Confidential Information about the numbers and types of patients affiliated with different chapters, which information was developed by the relationships Novo Nordisk developed.

28.     Stephens was privy to the Confidential Information and utilized such information during the course of performing his job duties for Novo Nordisk.

29.     Novo Nordisk actively protects the confidentiality of its Confidential Information by, among other things, requiring its employees to sign confidentiality, non-solicitation and non-compete agreements.

30.     In addition, access to Novo Nordisk's computer systems are restricted to authorized users who have individual user names and passwords.

31.     Moreover, access to Novo Nordisk's headquarters office is limited to employees, who have individually-issued identification badges that allow them access, as well as to authorized visitors who must register with security and be escorted by an employee.

**C.     Stephens' Restrictive Covenants With Novo Nordisk**

32.     Novo Nordisk hired Stephens on February 10, 2014.

33.     Prior to commencing his employment with Novo Nordisk, and as a condition of that employment, Stephens signed a Confidentiality, Non-Compete and Employee Invention Agreement, a copy of which is attached hereto as Exhibit "1."

34.     The Agreement provides, in part, as follows:

2.     I acknowledge that in the performance of my duties as an employee, I will acquire knowledge about the sensitive and confidential matters of competitive significance including but not limited to, the Company's products and their unique characteristics, the Company's marketing, pricing strategies, objectives and opportunities, the Company's internal procedures, forms, records, business plans, financial information, customer lists, plant or production methods, patents or pending patent applications, product research and development and the Company's arrangements with its employees, suppliers and customers (hereinafter referred to collectively as "Information").  I acknowledge that this information constitutes confidential commercial information and/or trade secrets, that are the property of the Company, in which it has invested substantial sums of capital and good will. . . .  I further acknowledge that the marketing and sales of pharmaceuticals . . . takes place in a highly competitive, worldwide market.  Therefore, I agree as follow:

      a)     I will not, during the term of my employment or at any time thereafter, use for my own benefit, or communicate or disclose to, or use for the benefit of any person or entity, any of the Information, except in the loyal performance of my duties for the Company.

. . . .

3.     In addition, during my employment and for a period of twelve months following the termination of my employment for any reason, voluntarily or involuntarily, (the "Non-Compete Period"), I will not individually compete, or be employed by, work for, advise, provide services to, or assist in any way any competitor of the Company by performing wok involving or related to the disease state in which I worked or was involved.  Also I will not individually compete, or be employed

by, work for, advise, provide services to, or assist in any way any competitor of the Company by working on, or having any involvement or communications with respect to, products that compete with or are the same as products that I worked on was involved with, or about which I had access to any information, during the last twelve months of my employment with the Company. . . . **In the event that the Company enforces the restriction on employment in this section 3 following the termination of my employment, the Company shall continue to pay my base salary during the Non-Compete Period (whether through employment, self-employment, consulting, contracting, or other services).**

. . .

13.    This Agreement shall be governed, interpreted and construed in accordance with the law of the State of New Jersey without regard to the principles of conflict of laws.

Exhibit 1 (emphasis added).

### D.    Stephens' Central Role in Novo Nordisk's Strategy for the Hemophilia Therapeutic Area

35.    Stephens began his employment with Novo Nordisk as District Business Manager II, responsible for managing a team of diabetes sales representatives in upstate New York.  Then, in August 2015, Stephens accepted a position with as a Regional Account Executive II, managing payer contracting for diabetes and obesity products in the New England region.  In January 2018, Stephens took on the role of Health Systems Account Manager.

36.    In or about September 2018, Novo Nordisk's Vice President of Sales, BioPharm, Todd Davey, hired Stephens into the HBRD position for the East Region.  Davey had been Stephens' supervisor since 2015, and when Davey transitioned to Novo Nordisk's BioPharm Division, he recruited Stephens.  This promotion came with a 10% salary increase for Stephens.

37.    Stephens was highly compensated as an HBRD for Novo Nordisk, with a significant compensation package of a base salary, bonuses, long-term incentives, and a range of employee benefits.

38.     As the HBRD for the East Region, Stephens was responsible for developing and executing the business and sales strategies for the Region, and driving the performance of approximately eight (8) hemophilia representatives.

39.     Stephens participated in a range of meetings where Confidential Information was discussed.  These included monthly strategic insight calls with personnel from Commercial Effectiveness, Marketing, and Sales, which included discussions of how the new structure and strategy of the hemophilia sales organization was working.

40.     Once or twice a year, Davey and each of the HBRDs came together at Novo Nordisk's headquarters in New Jersey for a full-day, in person Business Review Meeting.  The most recent meeting occurred just over two weeks ago, on August 21, 2019.  During that meeting, each HBRD provided a detailed report on Novo Nordisk's hemophilia business in their Regions (including sales performance by product, sales channel, and territory, and a summary and analysis of the Hemophilia A market in particular), identified the top accounts by territory, identified key areas of opportunity, and detailed the Region's strategies for differentiating Novo Nordisk's hemophilia products from competitors, as well as convincing patients to switch to NovoEight®, one of Novo Nordisk's treatments for Hemophilia A.  The presentations also provided in-depth information for certain key institutional accounts such as the Key Account Information, identifying the Key Opinion Leaders ("KOL's") by name (KOLs are typically doctors who are influential in determining hemophilia treatments at the hospital or institution), and additional strategic information.  The information shared in these presentations is confidential and developed through the time and effort of Novo Nordisk personnel.

41.     On information and belief, before joining Novo Nordisk, Stephens had no professional experience working in the hemophilia therapeutic area.

E.    <u>**Stephens' Voluntary Resignation to Join a Direct Competitor**</u>

42.    On August 15, 2019, Stephens advised Davey that he was considering an offer to join BioMarin in a role nearly identical to his HBRD position with Novo Nordisk.  Specifically, Stephens told Davey that BioMarin had offered him a role to lead the company's sales and marketing efforts in the Northeast for its treatment for Hemophilia A patients, including recruiting and hiring the sales team he would supervise.  Stephens also disclosed that BioMarin had offered him a substantial increase in his compensation package.

43.    Stephens and Davey discussed the opportunity again the next day, August 16, 2019, and Davey reminded Stephens that he had signed a non-compete agreement with Novo Nordisk.

44.    In an effort to retain Stephens, on or about August 19, 2019, Davey offered Stephens an increase in his salary and an additional one-time retention bonus.

45.    Davey sent Stephens the paperwork associated with the retention offer on August 20, 2019.  That same day, Stephens advised Davey that he intended to stay with Novo Nordisk.

46.    On August 21, 2019, after advising Davey that he would be staying at Novo Nordisk, Stephens attended the confidential Business Review Meeting with Davey and the other HBRDs from around the country, as described above.

47.    On August 22, 2019, Stephens abruptly changed course and advised Davey that he was resigning from his employment with Novo Nordisk.  Davey reminded Stephens again of his non-compete obligations under the Agreement.

48.    Stephens' employment with Novo Nordisk terminated on September 4, 2019.

49.    An analysis of Stephens' computer activity shows that on August 6, 2019, at a time when Stephens likely was actively pursuing employment with BioMarin, he copied to a

USB storage device several files that, on information and belief, contain Novo Nordisk's Confidential Information, including team goals, a target lists of HTCs and other accounts, an overview of HTCs in the East Region, and an overview of East Region hemophilia treatment professionals.

50.     An analysis of Stephens' computer activity also shows other suspicious activity, including the upload of files to DropBox, a third party cloud storage solution, close in time to the USB activity in early August 2019.  Novo Nordisk continues to investigate the nature of those uploads to determine whether the items uploaded contain Novo Nordisk Confidential Information.

**F.     BioMarin's Plan to Unfairly Compete with Novo Nordisk**

51.     Novo Nordisk has spent years selling Hemophilia A products and developing relationships with, and information about, patients and their families, HTCs, institutions, health care providers, and patient advocacy groups and chapters.  Though these efforts, which were made at considerable expense, Novo Nordisk has developed valuable relationships and good will with the hemophilia patient community, and significant Confidential Information that provides it with a competitive advantage over other companies offering Hemophilia A treatments.

52.     BioMarin is poised to enter the hemophilia therapeutic area for the first time with its new treatment.  By hiring Stephens to develop BioMarin's sales organization and strategy for the Northeast in a substantially identical role as that which he held for Novo Nordisk, BioMarin seeks to obtain the benefit of Novo Nordisk's relationships and good will, competitive intelligence, and Confidential Information, in the Hemophilia A market without the investment of time and resources made by Novo Nordisk.  In developing and implementing BioMarin's sales strategies for Hemophilia A in the Northeast, and preparing BioMarin to enter the

Northeastern Hemophilia A marketplace, Stephens will necessarily and inevitably use and disclose his Confidential Information about Novo Nordisk's Hemophilia A business in the Northeast.

53.     To obtain the value of Novo Nordisk's relationships and Confidential Information, BioMarin has offered Stephens a substantial compensation package.

54.     Put simply, BioMarin has engaged in a scheme calculated to recruit Stephens for a position nearly identical to the one he held with Novo Nordisk, to obtain the Company's Confidential Information, all in order to compete unlawfully with Novo Nordisk in the Hemophilia A therapeutic area.

## COUNT I
### (Breach of Contract as to Defendant Stephens)

55.     Novo Nordisk repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

56.     Novo Nordisk has fully performed all of its obligations under the Confidentiality, Non-Compete and Employee Invention Agreement.

57.     All conditions precedent to the bringing of this action have occurred, been performed, or waived.

58.     Stephens was and continues to be bound by the restrictive covenants of non-competition, non-solicitation, and non-disclosure set forth above.

59.     The restrictive covenants of non-competition, non-solicitation, and non-disclosure are supported by adequate consideration and are valid and enforceable under applicable law.

60.     Given the global nature of Novo Nordisk's business, Stephens' status within Novo Nordisk, his exposure to the Company's Confidential Information, and the high compensation paid for his obligations, the restrictive covenants of non-competition, non-

solicitation, and non-disclosure are reasonable in duration, geographic scope and line of business.

61.     The restrictive covenants of non-competition, non-solicitation, and non-disclosure are necessary and tailored to protect Novo Nordisk's legitimate business interests, including but not limited to Novo Nordisk's goodwill, relationships with existing and prospective customers and other key members of the hemophilia patient community, and confidential, proprietary, and trade secret information.

62.     As alleged in greater detail above, Stephens has announced that he intends to breach his restrictive covenants by commencing employment with BioMarin, which will directly compete with Novo Nordisk in the Hemophilia A therapeutic area.  In so doing, Stephens will necessarily and inevitably use and disclose Novo Nordisk's Confidential Information in breach of the Agreement.

63.     Stephens' announced and expected material breaches of his covenants in the Agreement not only will deprive Novo Nordisk of the benefit of its bargain with Stephens but also will cause irreparable harm to Novo Nordisk's goodwill, customer relations, market share, and competitive advantage in the marketplace.

64.     Novo Nordisk has no adequate remedy at law, and will suffer substantial and irreparable harm unless Stephens is enjoined as requested below.

## COUNT II
### (Unfair Competition as to Defendants)

65.     Novo Nordisk repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

66.     Defendants are engaging in unfair competition by Stephens' employment with BioMarin, despite his restrictive covenants with Novo Nordisk, thereby using and disclosing Novo Nordisk's Confidential Information in violation of the Agreement.

67.     Defendants' conduct will cause irreparable harm to Novo Nordisk's goodwill, customer relations, market share and competitive advantage in the market place.

68.     Defendants' conduct is intentional, willful, outrageous and malicious, and justifies the imposition of punitive damages.

69.     Novo Nordisk has no adequate remedy at law, and will suffer substantial and irreparable harm unless Defendants are enjoined as requested below.

**COUNT III**
**(Violation of the Federal Defend Trade Secrets Act as to all Defendants)**

70.     Novo Nordisk repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

71.     The actions of Defendants, as described above, constitute violations of the federal Defend Trade Secrets Act ("DTSA").

72.     The DTSA provides, in relevant part: "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

73.     The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable . . . ." 18 U.S.C. § 1836(b)(3)(A).

74.     Novo Nordisk's Confidential Information constitutes trade secrets that are not generally known to the public and are not readily ascertainable through proper means by Novo

Nordisk's competitors, including but not limited to the Company's business and sales strategies, information about the effectiveness of those strategies, identities and information relating to hemophilia patients; information relating to HTCs, hematologists, institutions and hospitals, and patient advocacy groups and chapters.

75.     This Confidential Information is related to Novo Nordisk's sales in the Hemophilia A therapeutic area, which Novo Nordisk uses in interstate commerce.

76.     Novo Nordisk's Confidential Information derives independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic benefit from the disclosure or use of the information.

77.     The Confidential Information possessed by Novo Nordisk was communicated to Stephens in confidence by the Company, solely in connection with his employment with the Company and on the basis that it would not be disseminated beyond those authorized to know it.

78.     As shown above, Stephens has or inevitably will misappropriate Novo Nordisk's Confidential Information by, among other things, using and disclosing, or threatening to use and disclose, the trade secrets without Novo Nordisk's consent during his employment with BioMarin.

79.     Defendants acquired, received and possess, or inevitably will acquire, receive and possess, Novo Nordisk's Confidential Information, knowing that Confidential Information to have been misappropriated without Novo Nordisk's authorization and in violation of Stephens' contractual, statutory, and common law commitments and obligations to Novo Nordisk.

80.     Upon information and belief, Defendants intend to convert Novo Nordisk's Confidential Information to the economic benefit of themselves, without Novo Nordisk's

consent, to poach the customers or prospective customers of Novo Nordisk for Defendants' economic benefit.

81.     Novo Nordisk has no adequate remedy at law, and will suffer substantial and irreparable harm unless Defendants are enjoined as requested below.

## COUNT IV
**(Violation of the New Jersey Trade Secrets Act as to all Defendants)**

82.     Novo Nordisk repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

83.     Stephens continues to be bound by his obligations to not use or disclose Novo Nordisk's Confidential Information.

84.     Novo Nordisk's Confidential Information derives independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic benefit from the disclosure or use of the information.

85.     Stephens has or will inevitably disclose to BioMarin, or use on behalf of BioMarin and for BioMarin's exclusive benefit, Novo Nordisk's Confidential Information without the express or implied consent of the Company.

86.     Novo Nordisk is therefore entitled to all relief available pursuant to the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1 et seq.

87.     Novo Nordisk has no adequate remedy at law, and will suffer substantial and irreparable harm unless Defendants are enjoined as requested below.

## COUNT V
### (Tortious Interference with a Contract as to Defendant BioMarin)

88.     Novo Nordisk repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

89.     Upon information and belief, BioMarin has actual knowledge of Stephens' Agreement with Novo Nordisk, including the restrictive covenants of non-competition, non-solicitation, and non-disclosure.

90.     Since learning of Stephens' contractual obligations to Novo Nordisk, BioMarin has still offered to employ Stephens in a position nearly identical to the one he held for Novo Nordisk.

91.     BioMarin has intentionally and without justification interfered with the contractual relationship between Novo Nordisk and Stephens by inducing him to leave the Company and to join BioMarin in direct violation of the Agreement.

92.     Novo Nordisk has no adequate remedy at law, and will suffer substantial and irreparable harm unless Defendants are enjoined as requested below.

## PRAYER FOR RELIEF

**WHEREFORE**, Novo Nordisk respectfully requests the Court to award the following relief:

A.     Temporary, preliminary, and permanent injunctive relief prohibiting Stephens from engaging in the unlawful conduct alleged herein, including (i) enjoining Stephens, for a period of one year, from violating the terms of his Agreement with Novo Nordisk by providing services, assisting in any way, advising, or performing work involving or relating to Hemophilia A for any competitor of Novo Nordisk (including BioMarin), or being employed by, working for, advising, providing services to, or assisting in any way any competitor of Novo Nordisk

(including BioMarin) by working on, or having any involvement or communications with respect to products that compete with Novo Nordisk's products to treat Hemophilia A; and (ii)  enjoining Mr. Stephens from violating the terms of his Agreement with Novo Nordisk by using, disclosing, or misappropriating any Confidential Information;

B.      Temporary, preliminary and permanent injunctive relief prohibiting BioMarin from engaging in the unlawful conduct alleged herein, including (i) enjoining BioMarin, for a period of one year, from employing Stephens to perform any work described in Paragraph A above; and (ii) enjoining BioMarin from using, disclosing, or misappropriating any Confidential Information.

C.      Damages;

D.      Punitive damages;

E.      Reasonable attorneys' fees and costs incurred in this action; and

F.      Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

s/ Thomas A. Linthorst
Thomas A. Linthorst
Jason J. Ranjo (*pro hac vice forthcoming*)
*Attorneys for Plaintiff*
*Novo Nordisk Inc.*

## **VERIFICATION**

I, Todd Davey, hereby verify that the facts set forth in the foregoing Verified Complaint are true and correct, based on my personal knowledge, information and belief, and knowledge obtained by me in the performance of my duties as Vice President of Sales, BioPharm, for Novo Nordisk Inc.  I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

TODD DAVEY

Executed on September 5, 2019

**EXHIBIT 1**

## Confidentiality, Non-Compete and Employee Invention Agreement

Complete and FedEx back
to Novo Nordisk



**In consideration of my employment by Novo Nordisk Inc., its parent company, and/or any of their respective subsidiaries or affiliates (the "Company"), I agree to the following:**

**1.** I will devote my time, skill, labor, and knowledge to the advancement of the Company's interest by performing such duties as may have been or may be assigned to me by the Company.

**2.** I acknowledge that in the performance of my duties as an employee, I will acquire knowledge about the sensitive and confidential matters of competitive significance including but not limited to, the Company's products and their unique characteristics; plans and strategies relating to marketing, business development, and pricing; Company objectives and opportunities; and the Company's internal procedures, forms, records, business plans, financial information, customer lists and information, plant or production methods, patents or pending patent applications, product research and development, and the Company's arrangements with its employees, vendors, suppliers, partners, and customers (hereinafter referred to collectively as "Information"). I acknowledge that this Information constitutes confidential commercial information and/or trade secrets, that are the property of the Company, in which it has invested substantial sums of capital and good will. I further acknowledge that the marketing and sales of pharmaceuticals, including insulin and biopharmaceutical injection devices, which is the principal business of the Company, takes place in a highly competitive, worldwide market. Therefore, I agree as follows:

**a)** I will not, during the term of my employment or at any time thereafter, use for my own benefit, or communicate or disclose to, or use for the benefit of, any person or entity, any of the Information, except in the loyal performance of my duties for the Company.

**b)** I agree that the Company has all rights to possession of, and all title in and to, all papers, documents, drawings, notebooks, copies, abstracts and summaries thereof, whether in hard copy or stored on computer, which I may originate or which may come into my possession during my employment and which relate to the business of Company. Upon termination of my employment with the Company, I will turn over promptly, in a manner and form satisfactory to the Company, all documents, books, records and other property (i.e. credit cards, cell phone, pager, car, etc.) belonging to the Company or relating to the Company's business, or the employees, vendors, suppliers, partners, and customers of the Company, whether in hard copy or stored on computer or any other media, without making or retaining any copies.

**3.** In addition, during my employment and for a period of twelve months following the termination of my employment for any reason, voluntarily or involuntarily, (the "Non-Compete Period"), I will not individually compete, or be employed by, work for, advise, provide services to, or assist in any way any competitor of the Company by performing work involving or related to the disease state in which I worked or was involved. Also, I will not individually compete, or


novo nordisk

be employed by, work for, advise, provide services to, or assist in any way any competitor of the Company by working on, or having any involvement or communications with respect to, products that compete with or are the same as products that I worked on, was involved with, or about which I had access to any Information, during the last twelve months of my employment with the Company. Said Non-Compete Period shall commence on the day upon which I shall actually leave my employment with the Company, even if such date is prior to the expiration of any non-working notice of termination given. In the event that the Company enforces the restriction on employment in this section 3 following the termination of my employment, the Company shall continue to pay my base salary during the Non-Compete Period, offset and reduced by any wages, compensation or other amounts I earn during the Non-Compete Period (whether through employment, self-employment, consulting, contracting, or other services).

Further, during my employment and the Non-Compete Period, I will not solicit, induce, or encourage, or attempt to solicit, induce, or encourage any officer, manager, employee, or consultant of the Company to leave the Company or to be hired for any work or employment by any other person or entity, whether or not such persons would commit a breach of a contract of employment by reason of leaving the service of the Company.

4. I acknowledge that the provisions of sections 2 and 3 are reasonable and necessary to protect the legitimate business interests of the Company, and without the limited restrictions imposed by the provisions of these sections the Company would suffer immediate and irreparable harm. I acknowledge and agree that the business engaged in by the Company is worldwide and accordingly the geographic scope of the covenant set forth in this section is completely reasonable and presents, and will present no undue hardship to myself. Further, I agree that in the event of a breach or a threatened or attempted breach by myself, the Company shall be entitled in any court of competent jurisdiction to a temporary, preliminary, and permanent injunction, without the necessity of pleading or showing any actual damages, or to a decree of specific performance of the provisions of sections 2 and 3. Such equitable relief shall not bar or reduce any other remedy or relief (equitable or legal) to which the Company may be entitled.

5. I agree that any interests in copyrights, trademarks, patents, patent applications, inventions, discoveries, developments and processes (collectively known as "Discoveries") which I may conceive, discover, invent or develop during the term of my employment and for six (6) months thereafter shall be and remain the property of Company or its nominees, successors or assigns. In addition, I agree to disclose promptly and in writing to an officer of the Company, or as directed by the Company, all Discoveries which I, alone or with others, have made or conceived or may make or conceive during my employment by the Company and for six (6) months thereafter. I hereby assign any and all Discoveries to the Company and further agree to execute any assignment or other instrument as the Company may deem reasonably necessary to evidence, establish, maintain, protect, enforce and/or defend any and all of the Company's interests under this section and shall do so without further compensation or consideration. All such interests shall vest in the Company, whether or not such instrument is requested, executed or delivered.

6. During the term of my employment, I shall not render my services directly or indirectly, and/or perform services as an employee for, manage, operate, join, control, participate in, assist, advise, provide consulting services to or for, or otherwise be connected with any entity which is engaged in a business similar to, or competitive with, the Company. Any secondary employment must comply with the terms and conditions of the Conflicts of Interest Policy and all other applicable Company policies.

**7.** I represent and warrant that I have not been debarred pursuant to the terms of the Federal Food, Drug and Cosmetic Act.

**8.** I represent that I am not party to any contracts or agreements with previous employers or others that might restrict my right to seek employment with the Company.

**9.** I represent that I can perform my duties for the Company without using any trade secrets or confidential information of another company, and I agree that I will not use or disclose any such trade secret or confidential information during my employment with the Company.

**10.** My employment with the Company is at-will, and both the Company and I have the right to terminate my employment at any time and for any reason, with or without notice and with or without cause. I understand that my obligations under this Agreement will continue during the term of my employment with the Company and thereafter. I acknowledge that I am governed by the applicable policies and practices of the Company as presently in effect and as such policies and practices may be amended from time to time.

**11.** This Agreement may be assigned by the Company, but shall not be assignable by myself. This agreement is binding and shall inure to the benefit of myself and the Company and its successors in interest.

**12.** This Agreement supersedes all prior agreements between the Company and myself with respect to the matters addressed herein.

**13.** This Agreement shall be governed, interpreted and construed in accordance with the law of the State of New Jersey without regard to the principles of conflict of laws.

**14.** If a court of competent jurisdiction determines that any portion of this Agreement is unenforceable for any reason, the remainder of this Agreement shall be enforced without regard to the unenforceable portion. If any court of competent jurisdiction construes any portion of this Agreement to be unenforceable because of the scope, duration or geographic coverage, then such court shall reduce the scope, duration or geographic coverage to the maximum scope, duration or geographic coverage allowed by law or equity and, in its reduced form, such portion of the Agreement, together with the remainder of the Agreement, shall then be enforceable and shall be enforced.

**15.** I represent and warrant that I have been advised of my right to retain independent legal counsel in connection with the execution of this Agreement and that I have either retained and been represented by such legal counsel or have knowingly and voluntarily waived my right to such legal counsel.

I have indicated my agreement to the foregoing by signing this original document and retaining a signed copy for my records.

Agreed and accepted this _____ 24 _____ day of ___ January ___ , 20 __ 14 __

_____        ___ James V. Stephens ___
Signature                        Print Name

novo nordisk